UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RONALD BETHEL,

                              Plaintiff,

        v.

R.N. CHARLES WOLFF; SERGEANT
WAHLQUIST, Sgt. John Doe; DR. V.
BHOPALE; SID JOHNSON, Food Services
Administrator; SUPERINTENDENT
WILLIAM A. LEE; CAPTAIN CAREY;
ENRIQUE PAGAN, Physicians Assistant;
DR. FREDERICK BERNSTEIN, Health
Service Director;

                              Defendants.

No. 14-CV-6519 (KMK)

OPINION & ORDER

Appearances:

Ronald Bethel
Otisville, NY
*Pro Se Plaintiff*

John Eric Knudsen, Esq.
Neil Shevlin, Esq.
New York State Department of Law Litigation
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiff Ronald Bethel ("Plaintiff"), an incarcerated inmate proceeding pro se, filed the

instant Complaint and Amended Complaint against Defendants R.N. Charles Wolff, Sergeant

Wahlquist, Dr. V. Bhopale, Sid Johnston, Superintendent William Lee, Captain Carey, Enrique

Pagan, and Dr. Frederick Bernstein (collectively, "Defendants"), pursuant to 42 U.S.C. § 1983,

alleging that Defendants violated his Eighth Amendment constitutional rights by failing to

protect him from an assault by a fellow inmate and by failing to provide him adequate medical care.  (*See* Dkt. No. 9.)  Before the Court is Defendants' Motion for Summary Judgment.  For the reasons to follow, the Court grants the Motion.

## I.  Background

### A.  Factual Background

The following facts are taken from Defendants' Statement Pursuant to Rule 56.1 and the supporting documents accompanying the Motion.  (*See* Defs.' Statement Pursuant to Rule 56.1 ("Defs.' 56.1") (Dkt. No. 55).)  Although Plaintiff has not offered a statement of undisputed facts pursuant to Local Rule 56.1, Plaintiff's failure to file such a statement does not "absolve[] the district court of even checking whether the citation [in the Local Rule 56.1 Statement] supports the assertion."  *Giannnullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003).  Accordingly, the Court will examine the documents offered by Defendants in support of their statement pursuant to Local Rule 56.1

On September 26, 2013, Plaintiff was incarcerated at Green Haven Correctional Facility and was assigned to work in the kitchen area of the mess hall.  (*See* Am. Compl. ¶ II(D), ¶ 1 (Dkt. No. 9); *see also* Defs.' 56.1 ¶ 10.)  Around 7:55 AM, Plaintiff was attacked by another inmate who threw hot water at Plaintiff and cut his arm with a metal can lid.  (*See* Decl. of Neil Shevlin ("Shevlin Decl.") Ex. D (Dkt. No. 57); *see also* Defs.' 56.1 ¶ 10.)  Defendant Sergeant Wahlquist, who was assigned to supervise the "chow run," heard Plaintiff scream and looked over to investigate.  (*See* Decl. of Robert Wahlquist ("Wahlquist Decl.") ¶ 4; *see also* Defs.' 56.1 ¶ 11.)[1]  Wahlquist observed Plaintiff bent over with his hands covering his face and head, and

---

[1] The declarations of Defendants Dr. Frederick Bernstein, Charles Wolff, Dr. Vishmas Bhopale, Enrique Pagan, Superintendent William Lee, Sidney Johnston, Robert Wahlquist, and

also observed another inmate, Simard, holding a folded metal can lid and moving in a slashing motion toward Plaintiff.  (*See* Wahlquist Decl. ¶ 4; *see also* Defs.' 56.1 ¶ 11.)  Wahlquist ran toward Simard and yelled at him to drop the weapon, which he did.  (*See* Wahlquist Decl. ¶ 5; *see also* Defs.' 56.1 ¶ 12.)  Simard laid on the floor, face first, and Wahlquist applied mechanical restraints to Simard's hands.  (*See* Wahlquist Decl. ¶ 5; *see also* Defs.' 56.1 ¶ 12.)  Wahlquist summoned the medical staff and instructed Officer Neithardt to escort Plaintiff to the clinic for treatment.  (*See* Wahlquist Decl. ¶ 5; *see also* Defs.' 56.1 ¶ 13.)  Wahlquist took Simard to the Special Housing Unit.  (*See* Wahlquist Decl. ¶ 5; *see also* Defs.' 56.1 ¶ 13.)

Plaintiff testified that prior to the incident on September 26, 2013, he did not know Simard personally and had never spoken to him.  (*See* Shevlin Decl. Ex. F ("Pl.'s Dep. Tr."), at 94; *see also* Defs.' 56.1 ¶ 14.)  Plaintiff stated that he had never had a "situation" with Simard before, and he did not really understand what had happened or why Simard had attacked him. (*See* Pl.'s Dep. Tr. 14–15; *see also* Defs.' 56.1 ¶ 14.)  None of Defendants responsible for supervising the mess hall was aware of any animosity between Plaintiff and Simard or of any danger to Plaintiff from Simard.  (*See* Lee Decl. ¶ 4; Johnston Decl. ¶ 4; Wahlquist Decl. ¶ 7; Carey Decl. ¶ 5; *see also* Defs.' 56.1 ¶¶ 15–18.)

Inmates are assigned to work in the mess hall on a case-by-case basis by a Program Committee.  (*See* Lee Decl. ¶ 6; Johnston Decl. ¶ 6; *see also* Defs.' 56.1 ¶ 19.)  Neither Lee nor Johnston was directly responsible for assigning inmates to work in the mess hall.  (*See* Lee Decl. ¶ 6; Johnston Decl. ¶ 6; *see also* Defs.' 56.1 ¶¶ 20–21.)  The only firm criteria for working in the mess hall is passing a medical evaluation.  (*See* Lee Decl. ¶ 6; Johnston Decl. ¶ 6.)

---

Daniel Carey, as well as the declaration of non-defendant Dr. Richard Wurzel, are attached to the declaration of Neil Shevlin.

A civilian staff supervises the production and service of food.  (*See* Johnston Decl. ¶ 8; *see also* Defs.' 56.1 ¶ 23.)  The security staff, which consists of correction officers and their supervisors, monitors the mess hall, the use of tools, and the disposal of sanitation.  (*See* Johnston Decl. ¶ 8; *see also* Defs.' 56.1 ¶ 24.)  Correction officers responsible for supervising the mess hall are normally situated in the tool room and out on the floor during meal service, and make rounds throughout the day.  (*See* Johnston Decl. ¶¶ 7–8; *see also* Defs.' 56.1 ¶¶ 26–27.)  On the day Plaintiff was attacked, there were several correction officers monitoring the mess hall and kitchen area.  (*See* Wahlquist Decl. ¶ 4; *see also* Defs.' 56.1 ¶ 28.)

After Wahlquist summoned the medical staff, Defendant Charles Wolff, a nurse, and Nurse Colonie responded and arrived at the mess hall to find Plaintiff sitting with security.  (*See* Wolff Decl. ¶ 3; *see also* Defs.' 56.1 ¶ 30.)  Plaintiff appeared to be alert and oriented.  (*See* Wolff Decl. ¶ 3; Shevlin Decl. Ex. A ("Medical Records"), at 0080; *see also* Defs.' 56.1 ¶ 30.)  Wolff and Colonie escorted Plaintiff to the medical clinic at Green Haven, where they noted that Plaintiff had first degree burns on the left side of his face, both of his eyelids, his forehead, and the left side of his neck and shoulder.  (*See* Wolff Decl. ¶ 4; Pagan Decl. ¶ 6; Medical Records at 0080, 0082, 0110; Shevlin Decl. Ex. B; *see also* Defs.' 56.1 ¶ 31.)  Plaintiff also suffered a superficial second degree burn on his right forearm that was approximately the size of a quarter; he also had a 3/4 inch superficial laceration on the same forearm.  (*See* Wolff Decl. ¶ 4; Pagan Decl. ¶ 6; Medical Records at 0080, 0082, 0110; Shevlin Decl. Ex B; *see also* Defs.' 56.1 ¶ 32.)  Wolff and Colonie applied cold compresses to the burns and notified Defendant Enrique Pagan, a physician's assistant who was supervising the clinic that morning, requesting that Pagan assess Plaintiff's condition and prescribe a course of treatment.  (*See* Wolff Decl. ¶ 5; Pagan Decl. ¶ 2; Medical Records at 0082; Shevlin Decl. Ex. B; *see also* Defs.' 56.1 ¶ 33.)  Pagan directed Wolff

and Colonie to provide Plaintiff with Ibuprofen for the pain; apply Silvadene, a topical cream, to the first degree burns, other than the eyelids, to prevent infection; and apply Bacitracin to the second degree burn and to his eyelids to prevent infection and to keep the tissue moist.  (*See* Wolff Decl. ¶ 5; Pagan Decl. ¶ 7; Medical Records at 0080, 0082, 0109; Shevlin Decl. Ex. B; *see also* Defs.' 56.1 ¶ 37.)  Plaintiff was not sent to an outside hospital.

According to Defendants, there is no policy at Green Haven of denying inmates the ability to go to an outside hospital for treatment of first and superficial second degree burns. (*See* Bernstein Decl. ¶ 4; Lee Decl. ¶ 9; *see also* Defs.' 56.1 ¶ 34.)  Here, the decision to keep Plaintiff at the infirmary instead of sending him to a hospital was based on the treating physician's and assistant's determination that Plaintiff's wounds were not serious enough to warrant sending him to an outside hospital.  (*See* Bhopale Decl. ¶ 4; Pagan Decl. ¶ 3; *see also* Defs.' 56.1 ¶ 34.)  Defendants indicate that first degree burns are typically treated with cold water or cold compresses, and that the next step is to apply topical ointment or cream to the affected area.  (*See* Bernstein Decl. ¶ 5; Bhopale Decl. ¶ 4; Pagan Decl. ¶ 4; *see also* Defs.' 56.1 ¶ 35.)  If there is any sign of infection, antibiotics are given.  (*See* Bernstein Decl. ¶ 5; Bhopale Decl. ¶ 4; Pagan Decl. ¶ 4; *see also* Defs.' 56.1 ¶ 35.)  Second degree burns are classified as either superficial or deep.  (*See* Bhopale Decl. ¶ 6; Pagan Decl. ¶ 5; *see also* Defs.' 56.1 ¶ 36.) Superficial second degree burns receive largely the same treatment as first degree burns, but superficial second degree burns may also result in blisters, which, if large, should be ruptured. (*See* Bhopale Decl. ¶ 6; Pagan Decl. ¶ 5; *see also* Defs.' 56.1 ¶ 36.)  Deep second degree burns are also treated similarly, but may sometimes require more invasive intervention, such as surgical excision of dead tissue and a skin graft.  (*See* Bhopale Decl. ¶ 6; Pagan Decl. ¶ 5; *see also* Defs.' 56.1 ¶ 36.)  Inmates at Green Haven who suffer any type of second degree burns are

placed in an isolation room to reduce the possibility of infection.  (*See* Bhopale Decl. ¶ 6; Pagan Decl. ¶ 5; *see also* Defs.' 56.1 ¶ 36.)  It is the opinion of Defendants that Plaintiff suffered only first degree burns and superficial second degree burns.  (*See* Bhopale Decl. ¶ 6; Pagan Decl. ¶ 5; *see also* Defs.' 56.1 ¶ 36.)

Later on September 26, after treating his wounds, Wahlquist gave Plaintiff the opportunity to be placed into protective custody, but Plaintiff declined.  (*See* Wahlquist Decl. ¶ 6; Shevlin Decl. Ex. C; *see also* Defs.' 56.1 ¶ 38.)  Plaintiff was, however, placed in an isolation room at the infirmary to prevent infection.  (*See* Pagan Decl. ¶ 7; *see also* Defs.' 56.1 ¶ 39.)

The next morning, the nursing staff noted that Plaintiff appeared to be resting comfortably, but a large blister had developed on his left eye and was leaking clear liquid.  (*See* Medical Records at 0110; *see also* Defs.' 56.1 ¶ 40.)  Plaintiff was given gauze pads to pat the blister.  (*See* Medical Records at 0110; *see also* Defs.' 56.1 ¶ 40.)  Later that same morning, Defendant Dr. Vishmas Bhopale, Plaintiff's primary care physician at the time, saw Plaintiff.  (*See* Bhopale Decl. ¶ 10; *see also* Defs.' 56.1 ¶ 41.)  Plaintiff told Dr. Bhopale that he thought the burn area was looking better, and Dr. Bhopale agreed.  (*See* Bhopale Decl. ¶ 10; *see also* Defs.' 56.1 ¶ 41.)  Dr. Bhopale continued the treatment of Silvadene and Bacitracin, and also directed that Plaintiff should start taking Amoxicillin, an antibiotic, for seven days.  (*See* Bhopale Decl. ¶ 10; Medical Records at 0109–0110; *see also* Defs.' 56.1 ¶ 42.)

On the afternoon of September 27, the nursing staff observed that Plaintiff's left eye, which had previously been swollen shut, was less swollen and Plaintiff was able to open it.  (*See* Medical Records at 0110; *see also* Defs.' 56.1 ¶ 43.)  Plaintiff showered and then received treatment of Silvadene and Bacitracin.  The dressing on Plaintiff's forearm was changed.  (*See*

Medical Records at 0110; *see also* Defs.' 56.1 ¶ 44.)  That evening, the nursing staff noted that the burn on the left side of Plaintiff's face was improving and the dressing to his right forearm was intact, but also documented that Plaintiff had blisters on the left side of his neck and left eyelid.  (*See* Medical Records at 0111; *see also* Defs.' 56.1 ¶ 45.)  The nursing staff applied Silvadene and noted that Plaintiff's swelling was subsiding and his vital signs were normal.  (*See* Medical Records at 0111; *see also* Defs.' 56.1 ¶ 45.)

The next morning, on September 28, the nursing staff noticed that Plaintiff's left eyelid was swollen, but that Plaintiff's vision was intact.  (*See* Medical Records at 0111; *see also* Defs.' 56.1 ¶ 46.)  The dressing on Plaintiff's forearm was clean and his vital signs were normal.  (*See* Medical Records at 0111; *see also* Defs.' 56.1 ¶ 46.)  Later that same morning, the nursing staff noted that Plaintiff's left eye was much less swollen, that he had small blisters on his forehead and open skin areas, and that he had two small open areas on his forearm.  (*See* Medical Records at 0111; *see also* Defs.' 56.1 ¶ 47.)  Plaintiff showered and had his dressing changed.  (*See* Medical Records at 0111; *see also* Defs.' 56.1 ¶ 48.)  Plaintiff refused Silvadene and Bacitracin to his face because he was going to the visiting room to see his family, but he indicated he would allow those medications to be applied upon his return.  (*See* Medical Records at 0111; *see also* Defs.' 56.1 ¶ 48.)

That afternoon, Plaintiff was seen by Dr. Bentivegna and told him that he had no complaints except dryness in the burned areas.  (*See* Bhopale Decl. ¶ 15; Medical Records at 0112; *see also* Defs.' 56.1 ¶ 50.)  Later that day, the nursing staff examined Plaintiff and noted blistering on Plaintiff's forehead and peeling to areas of his face, but also noted that Plaintiff denied any pain.  (*See* Medical Records at 0112; *see also* Defs.' 56.1 ¶ 51.)  Plaintiff's dressing

was changed, Bacitracin was applied, and Plaintiff was given an antibiotic.  (*See* Medical Records at 0112; *see also* Defs.' 56.1 ¶ 51.)

The next morning, September 29, Plaintiff was seen by the nursing staff, who observed that he was resting comfortably and had no complaints.  (*See* Medical Records at 0112; *see also* Defs.' 56.1 ¶ 52.)  The dressing on Plaintiff's forearm was changed.  (*See* Medical Records at 0112; *see also* Defs.' 56.1 ¶ 52.)  At noon, Plaintiff complained that the skin on his face was itching, and the nursing staff saw that the skin on his forehead was peeling and that the skin on his cheeks was dry.  (*See* Medical Records at 0112; *see also* Defs.' 56.1 ¶ 53.)  The staff noted that Plaintiff's vital signs were normal and that his appetite was good; Plaintiff then showered and received his normal course of treatment.  (*See* Medical Records at 0112; *see also* Defs.' 56.1 ¶ 53.)  Plaintiff was also given a can of Bacitracin and was instructed to use it on the dry skin on his face.  (*See* Medical Records at 0112; *see also* Defs.' 56.1 ¶ 54.)  Plaintiff also reported a slight burning sensation on his forehead and was advised that if the symptom persisted, he should wash the Silvadene off and use Bacitracin.  (*See* Medical Records at 0112; *see also* Defs.' 56.1 ¶ 54.)

On September 30, the nursing staff noted that Plaintiff was awake and reading with no apparent distress or discomfort.  (*See* Medical Records at 0112; *see also* Defs.' 56.1 ¶ 56.)  The staff also noticed that the burns to Plaintiff's face were blistering and peeling, and Silvadene and Bacitracin were applied.  (*See* Medical Records at 0112; *see also* Defs.' 56.1 ¶ 57.)  The dressing to Plaintiff's forearm was dry and intact.  (*See* Medical Records at 0112; *see also* Defs.' 56.1 ¶ 57.)  Later that morning, Dr. Bhopale saw Plaintiff and noted that the burned areas were healing well and that there was no blistering.  (*See* Bhopale Decl. ¶ 18; Medical Records at 0107, 0113; *see also* Defs.' 56.1 ¶ 58.)  Dr. Bhopale directed that Bacitracin should continue to be

applied to the burn areas and that Plaintiff should be discharged from the infirmary, with a follow-up with Dr. Bhopale in one week.  (*See* Bhopale Decl. ¶ 18; *see also* Defs.' 56.1 ¶ 58.) Plaintiff did not indicate to Dr. Bhopale that he was in any kind of pain, was feeling dizzy, had blurred vision in his eyes, or had headaches.  (*See* Bhopale Decl. ¶ 18; *see also* Defs.' 56.1 ¶ 59.) Dr. Bhopale testified that had Plaintiff expressed those symptoms to him, Dr. Bhopale would have indicated those comments in the medical record and would have treated Plaintiff accordingly.  (*See* Bhopale Decl. ¶ 18; *see also* Defs.' 56.1 ¶ 60.)  Later that morning, the nursing staff noted that the skin on Plaintiff's forehead and face was peeling.  (*See* Medical Records at 0113; *see also* Defs.' 56.1 ¶ 61.)  Plaintiff showered and Silvadene was applied to his forehead, Bacitracin was applied to his other wounds, and a bandage was placed on his forearm. (*See* Medical Records at 0080, 0113; *see also* Defs.' 56.1 ¶ 62.)  Plaintiff was instructed on his medications and was discharged from the infirmary.  (*See* Medical Records at 0080, 0113; *see also* Defs.' 56.1 ¶ 63.)

Approximately one week later, on October 7, Dr. Bhopale saw Plaintiff for the follow-up visit, noted that Plaintiff's burns had completely healed, and noted that he did not observe any permanent scarring or discoloration.  (*See* Bhopale Decl. ¶ 20; Medical Records at 0079; *see also* Defs.' 56.1 ¶ 64.)  Plaintiff did complain that his left eye was experiencing sensitivity to light and worsening vision, and while Dr. Bhopale did not see anything wrong with Plaintiff's eyes, because Plaintiff was already due for an examination by an optometrist, Dr. Bhopale submitted a request form for Plaintiff to see one.  (*See* Bhopale Decl. ¶ 20; Medical Records at 0122; *see also* Defs.' 56.1 ¶ 65.)  Plaintiff did not thereafter complain to Dr. Bhopale on a regular basis of headaches or eye pain.  (*See* Bhopale Decl. ¶ 22; *see also* Defs.' 56.1 ¶ 66.)

Plaintiff saw Dr. Richard Wurzel, an optometrist, on October 16, 2013 and October 14, 2014, for his complaints of eye dryness and irritation.  (*See* Wurzel Decl. ¶ 3; Medical Records at 0121, 0127; *see also* Defs.' 56.1 ¶ 67.)  During the examination on October 16, 2013, Dr. Wurzel noted a number of findings and symptoms consistent with dry eye syndrome from the hot water.  (*See* Wurzel Decl. ¶ 4; Medical Records at 0121; *see also* Defs.' 56.1 ¶ 68.)  Dr. Wurzel prescribed glasses, non-preserved artificial tears, and ocular ointments.  (*See* Wurzel Decl. ¶ 4; Medical Records at 0121; *see also* Defs.' 56.1 ¶ 68.)  On October 14, 2014, Dr. Wurzel observed that Plaintiff's issues had slightly improved and noted continuing symptoms consistent with mild dry eye syndrome.  (*See* Wurzel Decl. ¶ 5; Medical Records at 0127; *see also* Defs.' 56.1 ¶ 69.)  Dr. Wurzel renewed the prescription for artificial tears and ointments.  (*See* Wurzel Decl. ¶ 5; Medical Records at 0127; *see also* Defs.' 56.1 ¶ 69.)

Dr. Wurzel does not believe that Plaintiff suffered any long-term injuries to his eyes as a result of the incident in 2013.  (*See* Wurzel Decl. ¶ 6; *see also* Defs.' 56.1 ¶ 70.)  Dr. Wurzel points out that the symptoms discussed in the Amended Complaint—light sensitivity, throbbing pain, impaired vision, pounding headaches, and permanent burn and discoloration to the areas around his eyes—are not consistent with his diagnosis of mild dry eye syndrome.  (*See* Wurzel Decl. ¶ 7; *see also* Defs.' 56.1 ¶ 71.)  Dr. Wurzel further notes that Plaintiff did not raise any of the symptoms he now alleges when he met with Dr. Wurzel in 2013 and 2014.  (*See* Wurzel Decl. ¶¶ 7, 10; Medical Records at 0121, 0127; *see also* Defs.' 56.1 ¶¶ 71, 74–75.)  Dr. Wurzel also points out that dry eyes can be caused by a number of conditions, and that given Plaintiff's recovery between 2013 and 2014, Dr. Wurzel does not believe the hot water caused the diagnosed dry eye syndrome.  (*See* Wurzel Decl. ¶ 8; *see also* Defs.' 56.1 ¶ 72.)  Moreover,

Plaintiff is over the age of 40, and eye deterioration, particularly with respect to Plaintiff's astigmatism, is normal.  (*See* Wurzel Decl. ¶ 9; *see also* Defs.' 56.1 ¶ 73.)

On or about October 17, 2013, Plaintiff filed a grievance, alleging that the attack on him could have been prevented by staff and that he was denied adequate medical care.  (*See* Lee Decl. ¶ 9; Shevlin Decl. Ex. E, at 0010–0014; *see also* Defs.' 56.1 ¶ 76.)  At the conclusion of the investigation into the incident, Defendant William Lee, then the Superintendent at Green Haven, determined that the allegations of misconduct could not be substantiated.  (*See* Lee Decl. ¶ 10; Shevlin Decl. Ex. E, at 0016–0017; *see also* Defs.' 56.1 ¶ 77.)

B.  Procedural History

Plaintiff filed his Complaint on August 14, 2014.  (*See* Dkt. No. 1.)  Plaintiff filed an Amended Complaint on November 7, 2014.  (*See* Dkt. No. 9.)  Some Defendants filed an Answer on January 26, 2015.  (*See* Dkt. No. 22.)  The remainder, after being served, filed their Answer on April 14, 2015.  (*See* Dkt. No. 29.)  A case management order was entered on September 24, 2015, directing that all discovery was to be completed by January 31, 2016.  (*See* Order (Dkt. No. 36).)  After issues regarding Plaintiff's deposition and interrogatories were resolved, (*see* Dkt. Nos. 45–46), Defendants requested leave to move for summary judgment, (*see* Letter from John Knudsen, Esq., to Court (Feb. 11, 2016) (Dkt. No. 47)).  Plaintiff responded to the application shortly thereafter.  (*See* Pl.'s Answer to Summ. J. (Dkt. No. 48).)  The Court set a briefing schedule for the Motion.  (*See* Order (Dkt. No. 49).)  Before Defendants filed their Motion, Plaintiff filed an "Answer" to Defendant's Motion, which reiterated many of the points made in his earlier application.  (*See* Pl.'s Answer to Summ. J. (Dkt. No. 53).)  Defendants filed their Motion and accompanying papers on May 13, 2016.  (*See* Dkt. Nos. 54–58.)  Plaintiff did not respond.  Defendants thereafter informed the Court that they would not be

11

submitting a reply brief.  (*See* Letter from Neil Shevlin, Esq., to Court (July 6, 2016) (Dkt. No. 59).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

 "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts

showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d

Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the

pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014)

(internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009)

("When a motion for summary judgment is properly supported by documents or other

evidentiary materials, the party opposing summary judgment may not merely rest on the

allegations or denials of his pleading . . . .").

On a motion for summary judgment, a fact is material if it might affect the outcome of

the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental

Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).  At this stage,

"[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any

factual issues to be tried."  *Brod*, 653 F.3d at 164 (internal quotation marks omitted).  Thus, a

court's goal should be "to isolate and dispose of factually unsupported claims."  *Geneva Pharm.

Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323–24 (1986)).  Finally, the Second Circuit has instructed that "special

solicitude" should be afforded a pro se litigant on a motion for summary judgment, *see Graham

v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988); *see also Berry*, 137 F. Supp. 3d at 522 (same),

whereby a court should construe "the submissions of a pro se litigant . . . liberally" and interpret

them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*,

470 U.S. 471, 474 (2d Cir. 2006) (per curiam) (italics and internal quotation marks omitted).

When ruling on a motion for summary judgment, a district court should consider only

evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Group of Am.,*

13

*Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish

facts, the statements 'must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant . . . is competent to testify on the matters

stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4));

*see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires

a motion for summary judgment to be supported with affidavits based on personal

knowledge . . . .");  *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding

"statements not based on [the] [p]laintiff's personal knowledge");  *Flaherty v. Filardi*, No. 03-

CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is

whether a reasonable trier of fact could believe the witness had personal knowledge." (internal

quotation marks omitted));  *Zigmund v. Foster*, 106 F. Supp. 2d 352, 356 (D. Conn. 2000) (noting

that "[a]n affidavit in which the plaintiff merely restates the conclusory allegations of the

complaint" is insufficient to support a motion for summary judgment).  In addition, "a pro se

party's bald assertion, completely unsupported by evidence, is not sufficient to overcome a

motion for summary judgment."  *Berry*, 137 F. Supp. 3d at 520 (internal quotation marks

omitted);  *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) ("The non-moving party

may not rely on conclusory allegations or unsubstantiated speculation.").

B.  Analysis

Plaintiff brings two claims under the Eighth Amendment—one for failure to protect

against Defendants Wahlquist, Carey, Johnston, and Lee; and one for deliberate indifference to a

serious medical need against all Defendants except Johnston.  (*See* Am. Compl. ¶ II(D), ¶¶ 22–

25.)  The Court will address each claim in turn.

1.  Failure to Protect

An inmate may state a claim under the Eighth Amendment against a prison official under the theory that prison officials failed to protect him or her.  *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) ("The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody.").  A plaintiff seeking to make such a claim must allege both an objective and subjective element: that "he is incarcerated under conditions posing a substantial risk of serious harm," and that the prison official had a "sufficiently culpable state of mind, to wit, [was] deliberately indifferent to the harmful conditions."  *Randle v. Alexander*, 960 F. Supp. 2d 457, 473 (S.D.N.Y. 2013) (emphasis and internal quotation marks omitted); *see also Parris v. N.Y. State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 362 (S.D.N.Y. 2013) (same); *Warren v. Goord*, 476 F. Supp. 2d 407, 410 (S.D.N.Y. 2007) (same).  Deliberate indifference exists "when an official 'has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.'"  *Parris*, 947 F. Supp. 2d at 363 (quoting *Hayes*, 84 F.3d at 620).

Assuming that Plaintiff has satisfied the objective element, and the Court is far from certain he has, Plaintiff has offered no indication, or even an allegation, that any of Defendants were on notice that Simard intended to harm Plaintiff or posed a threat to Plaintiff.  Even Plaintiff admits that he did not know Simard well at the time and had never had any altercations with Simard.  (*See* Pl.'s Dep. Tr. 14–15, 94.)  Moreover, none of Defendants named under this claim was aware of any conflict between Plaintiff and Simard or of any danger that Simard may have posed to Plaintiff.  (*See* Lee Decl. ¶ 4; Johnston Decl. ¶ 4; Wahlquist Decl. ¶ 7; Carey Decl. ¶ 5.)  "Courts routinely deny deliberate indifference claims based upon surprise attacks."  *Parris*,

15

947 F. Supp. 2d at 363 (internal quotation marks omitted).  In general, "[t]he plaintiff must allege that the defendants knew of a prior altercation between the plaintiff and his attacker, or of threats that had been made against the plaintiff."  *Id.*  In the absence of such evidence, there is no basis for a reasonable trier of fact to conclude that Defendants were aware of any threat of danger posed by Simard or others.  *See Dublin v. N.Y.C. Law Dep't*, No. 10-CV-2971, 2012 WL 4471306, at *7 (S.D.N.Y. Sept. 26, 2012) (granting summary judgment where there was no evidence that the defendant "knew of and disregarded a substantial risk of serious harm to [the] [p]laintiff"); *Fernandez v. N.Y.C. Dep't of Corr.*, No. 08-CV-4294, 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010) (dismissing the complaint where the plaintiff had not pled "that he and [his attacker] were involved in a prior altercation, that [the attacker] had previously threatened him, or that there was any other reason for officers at [the facility] to be on notice that there was a risk of altercation between [the] [p]laintiff and [his attacker]").

Similarly unavailing is Plaintiff's assertion that Defendants Johnston and Lee are liable for adopting an "unwritten policy sanctioning violent inmates with a history of violent prison behavior to work unsupervised."  (Am. Compl. ¶ II(D), ¶ 23.)  Plaintiff offers no support for this proposition, and Lee and Johnston expressly denied that any such policy existed.  (*See* Lee Decl. ¶ 5; Johnston Decl. ¶ 5.)  Instead, all inmates working in the mess hall were monitored by both civilian and security staff members.  (*See* Lee Decl. ¶ 7; Johnston Decl. ¶ 8.)  The security staff was positioned in the mess hall area and made rounds throughout the day.  (*See* Lee Decl. ¶ 7; Johnston Decl. ¶ 8.)  That Plaintiff was attacked and the correction staff were unable to stop it does not, on its own, show that correction officers were aware of a substantial risk and failed to protect Plaintiff against it; it shows merely that Plaintiff was the victim of a spontaneous outburst of violence.  "The state is not expected to be an insurer of inmate safety."  *Hartry v. County of*

*Suffolk*, 755 F. Supp. 2d 422, 440 (E.D.N.Y. Dec. 15, 2010). Outside of Plaintiff's conclusory allegations of gross negligence and failure to train, Plaintiff has offered no evidence to suggest that the incident involving Simad was anything but an unforeseeable, and unfortunate, incident. In such circumstances, no reasonable trier of fact could conclude that Plaintiff's constitutional rights were violated. Plaintiff's claim under the Eighth Amendment for failure to protect is thus conclusory and unsupported by any evidence in the record and, accordingly, judgment in favor of Defendants should be entered.

### 2. Deliberate Indifference to a Serious Medical Need

"The Eighth Amendment forbids deliberate indifference to serious medical needs of prisoners." *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (internal quotation marks omitted). "There are two elements to a claim of deliberate indifference to a serious medical condition." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009). "The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone*, 719 F.3d at 138 (internal quotation marks omitted). Under this objective requirement, a court must inquire first, "whether the prisoner was actually deprived of adequate medical care," and second, "whether the inadequacy in medical care is sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006). Under the first inquiry, adequate medical care is reasonable care such that "prison officials who act reasonably cannot be found liable." *Farmer*, 511 U.S. at 845. Under the second inquiry, the Court examines "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280. As part of this objective element, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). "There is no

settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has presented "a non-exhaustive list" of factors to consider: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)); *see also Morales v. Fischer*, 46 F. Supp. 3d 239, 247 (W.D.N.Y. 2014) (same).

Courts distinguish between situations where no medical attention is given and situations where medical attention is given, but is objectively inadequate. In the former, the Court need only "examine whether the inmate's medical condition is sufficiently serious." *Salahuddin*, 467 F.3d at 280. In the latter, however, the inquiry is "narrower"; for example, "if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'" *Id.* (quoting *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003)).

"The second requirement [of an Eighth Amendment deliberate indifference claim] is subjective: the charged officials must be subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138. Here, the inquiry is whether defendants "knew of and disregarded an excessive risk to [a plaintiff's] health or safety" while "both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference." *Caiozzo*, 581 F.3d at 72 (alterations and internal quotation marks omitted); *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference

could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness," and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) (internal quotation marks omitted); *see also Gladden v. City of New York*, No. 12-CV-7822, 2013 WL 4647193, at *2 (S.D.N.Y. Aug. 29, 2013) ("To meet the subjective element, the plaintiff must show that the defendant acted with more than mere negligence, and instead knew of and disregarded an excessive risk to inmate health or safety." (internal quotation marks omitted)). In contrast, "mere medical malpractice is not tantamount to deliberate indifference," unless "the malpractice involves culpable recklessness, i.e., . . . a conscious disregard of a substantial risk of serious harm." *Chance*, 143 F.3d at 703 (internal quotation marks omitted). Moreover, "mere disagreement over the proper treatment does not create a constitutional claim," and "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.*; *see also Crique v. Magill*, No. 12-CV-3345, 2013 WL 3783735, at *3 (S.D.N.Y. July 9, 2013) ("The mere fact that an inmate feels that he did not receive adequate attention . . . does not constitute deliberate indifference.").

There are a number of factual issues that hinder Defendants on this point. First, as Plaintiff points out, the medical records indicate that Plaintiff suffered only first degree burns on his face, eyelids, forehead, neck, and shoulder areas. (*See* Wolff Decl. ¶ 4; Pagan Decl. ¶ 6; Medical Records at 0080, 0082, 0110.) The medical records further indicate that Plaintiff subsequently experienced blistering on his eyelids, forehead, and neck. (*See* Medical Records at 0110–0112.) But in Bernstein's responses to Plaintiff's interrogatories, he testified that "[f]irst degree burns do not blister," (*see* Pl.'s Answer to Summ. J. (Dkt. No. 53) at unnumbered 30),

calling into question the accuracy of the initial diagnosis.  It is thus unclear what Defendants'

position is on the severity of the injuries to Plaintiff's eyelids, forehead, and neck.  Additionally,

although Dr. Wurzel testified that he found symptoms consistent with dry eye syndrome and

irritation from the hot water thrown in Plaintiff's face, he went on to conclude that it was his

opinion that the hot water did not cause the dry eye syndrome.  (*See* Wurzel Decl. ¶¶ 4, 8.)  It is

again unclear what Defendants' position is on this point.  Finally, although Defendants offer

detailed declarations from Bernstein, Bhopale, and Pagan attesting that Plaintiff's injuries were

minor and were treated appropriately, (*see* Bernstein Decl. ¶¶ 5–6; Bhopale Decl. ¶¶ 4–6; Pagan

Decl. ¶¶ 3–5), none of those individuals has been offered as an expert, and thus their testimony

regarding the appropriate care for Plaintiff and for burn victims generally cannot be considered

by the Court in determining whether adequate medical care was rendered, *cf., e.g.*, *Gill v. Am.*

*Red Cross*, No. 12-CV-348, 2013 WL 1149951, at *3 (D. Conn. Mar. 19, 2013) ("The testing,

protocol, and monitoring deficiencies [the] [p]laintiff alleges unquestionably implicate a medical

assessment as to whether [the decedent] was or was not a medically appropriate candidate for a

safe blood donation, which is necessarily beyond a layperson's ability to make an informed

judgment about." (citation omitted)).

　　　These deficiencies notwithstanding, summary judgment in favor of Defendants is still

appropriate.  Plaintiff does not allege or present evidence showing that he received no medical

attention; rather, he alleges (without any evidence in support) that he was denied access to

"adequate medical personnel qualified to exercise judgment about Plaintiff's [f]irst and [s]econd

degree burn," i.e., he should have been taken to a hospital.  (Am. Compl. ¶ II(D), ¶ 24.)

"[D]isagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of

treatment, or the need for specialists or the timing of their intervention, are not adequate grounds

for a [§] 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001); *see also id.* at 311 ("A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference.  Nor does the fact that an inmate might prefer an alternative treatment, or feels that he did not get the level of medical attention he preferred." (citations omitted)).  Plaintiff offers no evidence that Defendants' treatment of Plaintiff was inadequate, nor does he opine on what treatment should have been administered; he alleges only that he should have been taken to a hospital.  Such an allegation, unsupported by any competent evidence, is insufficient to move this case past summary judgment.  *See Micolo v. Fuller*, No. 15-CV-6374, 2016 WL 6404146, at *4 (W.D.N.Y. Oct. 28, 2016) ("To the extent that [the] [p]laintiff contends that he needed to be taken to a hospital for . . . sutures, these claims are without merit. . . .  [The] [p]laintiff has failed to raise an issue of fact regarding [the defendant's] qualifications to administer sutures."); *Simpson v. Town of Warwick Police Dep't*, 159 F. Supp. 3d 419, 446 (S.D.N.Y. 2016) (granting summary judgment against a plaintiff who alleged that he should have been taken to a hospital, because "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation" (internal quotation marks omitted)); *Porter v. Goord*, No. 04-CV-485, 2009 WL 2180580, at *12 (W.D.N.Y. July 22, 2009) (granting summary judgment for the defendants because the "[p]laintiff [did] not even allege, either in the [a]mended [c]omplaint or in his deposition testimony, suffering any further significant injury or pain based on any delayed or denied treatment, nor d[id] [the] [p]laintiff allege that as a result of the inadequate treatment, his injuries did not heal, or that their healing was delayed"), *aff'd*, 415 F. App'x 315 (2d Cir. 2011).

Moreover, Plaintiff has offered no facts upon which a reasonable trier of fact could conclude that any of Defendants disregarded a substantial risk to Plaintiff's safety or health. There is nothing about the facts presented that "shocks the conscience," *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996), nor are there facts suggesting that Defendants knew of and disregarded a substantial risk to Plaintiff, *see Nielsen*, 746 F.3d at 63, or even that such a risk existed.  The conclusory allegation in the Amended Complaint that the conduct here was "extreme and outrageous conduct of deliberate indifference to Plaintiff's serious medical need" is insufficient to rescue Plaintiff's claim from summary judgment.  *See Ravenell v. Van der Steeg*, No. 05-CV-4042, 2007 WL 765716, at *7 (S.D.N.Y. Mar. 14, 2007) (granting summary judgment where the plaintiff had "offer[ed] only his own conclusory allegations that [the defendant] consciously disregarded a substantial risk of serious harm through deliberate delay of treatment," and noting that the plaintiff's "bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment" (internal quotation marks omitted)); *Vondette v. McDonald*, No. 00-CV-6874, 2001 WL 1551152, at *5 (S.D.N.Y. Dec. 5, 2001) (granting summary judgment where the plaintiff "offer[ed] no evidence beyond his own conclusory allegations to show that [the] defendants acted with deliberate indifference to his medical needs").  Plaintiff's claim for deliberate indifference to a serious medical need thus fails.

### 3.  Plaintiff's Response

Although he did not offer a formal reply to Defendants' Motion, Plaintiff did submit, in anticipation of summary judgment, a document styled as an "Answer" to the anticipated Motion. (*See* Dkt. No. 53.)  In that document, Plaintiff points to a number of interrogatory responses by Defendants that, in his view, are evasive, inconsistent, or show that the supervision of the mess hall and the treatment of his injuries were inadequate.  However, Plaintiff highlights only

collateral issues in the proceeding. None of his arguments go to the heart of the Eighth Amendment claims—whether Defendants acted with deliberate indifference in denying Plaintiff medical care. The closest Plaintiff comes is to arguing that because Simard was able to attack Plaintiff, the supervision of the mess hall must have been inadequate. (*See id.* at unnumbered 2– 3, 5.) But as detailed above, the fact that Plaintiff was attacked does not lead to the conclusion that the attack must have been caused by the negligence of Defendants. And even if it did, there is still no evidence that any Defendant acted with deliberate indifference. In short, none of Plaintiff's contentions outlined in his Answer point to any evidence of deliberate indifference or address any of the arguments raised by Defendants in the Motion. Plaintiff's claims under the Eighth Amendment lack any basis in fact, and summary judgment for Defendants is therefore appropriate.

### III. Conclusion

Because Plaintiff has adduced no evidence in support of his allegations, the Court declines to address Defendants' remaining arguments regarding the personal involvement of various Defendants and qualified immunity.

For the foregoing reasons, the Motion is granted. The Clerk of Court is respectfully requested to terminate the pending Motion, (Dkt. No. 54), enter judgment for Defendants, and close the case.

SO ORDERED.

DATED:      February **10**, 2017
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

23